# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LAND O'LAKES, INC.,

               Plaintiff,

RURAL MUTUAL INSURANCE CO., et al.,          Case No. 14-C-1388

               Intervening Plaintiffs,

    v.

DANIEL J. RATAJCZAK, JR., et al.,

               Defendants.

## DECISION AND ORDER

Plaintiff Land O'Lakes filed this action against Defendants Daniel, Scott and Angela Ratajczak, and the Daniel J. Ratajczak, Jr. and Angela R. Ratajczak Revocable Trust, alleging that the defendants sold adulterated whey protein concentrate to Plaintiff for use in its food supplement for six years, ending in 2012. The case is before the court on the Ratajczaks' motion for summary judgment. Based on the facts set forth below, taken from the evidence viewed in a light most favorable to Plaintiff, the motion will be granted.

## BACKGROUND

For approximately six years, from 2006 to 2012, Land O'Lakes purchased Condensed Whey Protein Concentrate (WPC) from Packerland Whey Products, Inc. (Packerland). Feed-grade WPC is used to make milk-replacer products for calves and baby animals. Land O'Lakes uses WPC in its milk-replacer products exclusively as a source of true protein. WPC is the product obtained by

the removal of non-protein constituents from whey and whey is WPC's only ingredient. Land O'Lakes originally purchased the product from Packerland through Dairy Directions, Inc. (Dairy Directions), who acted as Packerland's agent for the sale of the WPC. During all times relevant to this lawsuit, Packerland was owned and operated by Daniel J. Ratajczak, Jr. (Daniel), Scott A. Ratajczak (Scott), and Angela Ratajczak (Angela) (collectively "the Ratajczaks").

Protein levels in milk products such as WPC are determined using the Kjeldahl Method, which measures nitrogen levels and calculates corresponding protein levels by using average nitrogen levels found in milk protein. The calculation of protein levels in milk-related products using the Kjeldahl method can be artificially inflated by adding compounds containing high levels of nitrogen to the product. Such compounds are commonly referred to as non-protein nitrogen (NPN). Urea is a highly nitrogenous product commonly used in fertilizer and can be a source of NPN. Adding urea to a milk-related product can trick testing under the Kjeldahl Method into showing a higher protein level for the product.

In approximately 2006, either Daniel, Scott, or Angela directed a Packerland employee to begin adding urea to the WPC in order to artificially increase its protein level. Urea costs much less than raw whey, so by substituting urea for raw whey Packerland was able to significantly increase the profits from the sale of WPC to Land O'Lakes. No one at Packerland ever disclosed to Land O'Lakes that urea was being added to the WPC. At times Land O'Lakes complained to the Ratajczaks that the WPC was emitting an ammonia odor. The Ratajczaks and other Packerland representatives responded to these complaints by blaming the odor on a number of factors, including an employee forgetting to shut off a valve to Packerland's ammonia tank, a malfunctioning valve, cross-contamination from Packerland's Lacto-Whey product, equipment not being rinsed properly,

and various equipment problems. Plaintiff alleges that these statements were knowing deceits, said to cover up the adulteration of the WPC.

Land O'Lakes also complained to the Ratajczaks and Packerland representatives about problems at Land O'Lakes' Browerville facility and the elevated levels of NPN in the WPC. Defendants blamed these problems on their suppliers, the use of a reverse osmosis system, various equipment problems, cross-contamination from other Packerland products, and the failure to properly rinse equipment. Plaintiff again alleges that these statements where false and that production problems and increased levels of non-protein nitrogen were caused by urea being added to the WPC. Due to these continued problems, Land O'Lakes investigated the problems with the WPC and began conducting laboratory testing on samples of the WPC in order to determine the cause of the ammonia odor. By April 2011, Land O'Lakes began testing all incoming loads of the WPC for solids, ash, crude protein, and NPN. In response to Land O'Lakes' increased testing of the WPC, the Ratajczaks began decreasing the amount of urea added to the WPC sold to Land O'Lakes. Land O'Lakes alleges that had it known that urea was being added to the Packerland WPC, it would have immediately stopped purchasing the WPC and commenced this lawsuit. Similarly, Land O'Lakes claims that had it known that the ammonia odor, elevated levels of NPN, and production problems it was experiencing with the Packerland WPC were caused by urea being added to the WPC, it would have immediately stopped purchasing the WPC and commenced this lawsuit. Land O'Lakes additionally alleges that Defendants adulterated WPC sold to Milk Specialties Global Nutrition Corporation (MSC) and concealed that adulteration through fraud as well.

3

On May 15, 2012, the Ratajczaks sold Packerland to Packerland Whey Intermediary Holding Company, Inc. (Packerland Holding) pursuant to a Stock Purchase Agreement. Neither the Ratajczaks nor any other Packerland representative ever disclosed to Packerland Holding that urea was being added to the WPC. Rather, Land O'Lakes alleges that the Ratajczaks and other Packerland representatives concealed from Packerland Holding that urea was being added to the WPC. In November or December of 2012, Packerland Holding discovered that the Ratajczaks had been adding urea to the WPC. After making this discovery, Packerland Holding terminated the employment of Daniel and Angela, with Scott subsequently resigning. Packerland Holding also threatened to sue the Ratajczaks and provided them with a copy of a draft verified complaint alleging claims for breach of contract, fraud, negligent misrepresentation, conspiracy to commit fraud, and breach of fiduciary duty. On December 28, 2012, the Ratajczaks (including Elizabeth Ratajczak, Scott's wife) entered into a Settlement Agreement with the buyers of Packerland under which the Ratajczaks and Elizabeth agreed, among other things, to pay Packerland Holding consideration in excess of $13 million to settle the claims referenced in the draft complaint.

In January 2013, the Ratajczaks filed an insurance-coverage lawsuit against Beazley Solutions, Ltd. ("Beazley"), the insurance company that insured the representations and warranties made by Daniel and Scott in the Stock Purchase Agreement. Summary judgment in favor of Beazley was granted in a decision and order dated August 17, 2016. *Ratajczak v. Beazley Sols. Ltd.*, No. 13-C-045. In May 2014, Beazley served Land O'Lakes with a subpoena for the production of documents relating to its business relationship with Packerland. After reviewing documents filed in that case Land O'Lakes learned that the Ratajczaks had been adding urea to the WPC since at least 2006.

4

# ANALYSIS

## A. Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

## B. Actual Injury Requirement

The Ratajczaks argue that all the claims should be dismissed because Land O'Lakes has suffered no actual injury in this case. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997) ("In light of our holding that the plaintiffs suffered no economic loss, we hold that this case falls within the 'no harm, no foul' rule."). Indeed, Land O'Lakes has not presented any evidence or even argued that they made less profit because of production problems resulting from Packerland's defective WPC. According to Land O'Lakes, it would be virtually impossible for it to show: (1) the specific loads of Packerland WPC used as an ingredient in specific production runs and the identification of products produced in those production runs; (2) the identification and quantity of any other ingredients that were combined with Packerland WPC to produce Land O'Lakes products that may have been adulterated by Packerland WPC; or (3) the distribution, sales,

5

or profits for any Land O'Lakes products that may have been adulterated by Packerland WPC. There is also no evidence that any Land O'Lakes customers had any problems with the end products being produced by Land O'Lakes with the Packerland WPC.

In response, Land O'Lakes accuses the Ratajczaks of asserting a "pass-on" defense that they argue fails as a matter of law. The term "pass-on" defense is taken from anti-trust law where the seller of a product sold at an unlawfully inflated price argues that the purchaser suffers no loss and cannot sue for treble damages when it simply passes on the increase to its own customers. The Supreme Court rejected this defense to anti-trust violations in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, because it was unwilling to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge. 392 U.S. 481, 492–93 (1968). The Court offered as a second reason for barring the pass-on defense its concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality" because indirect purchasers "would have only a tiny stake in the lawsuit" and hence little incentive to sue. *Id.* at 494. Here, neither reason applies because there was no loss to pass on. No evidence has been offered that either Land O' Lakes or its customers suffered any loss. Had there been a loss to Land O' Lakes or its customers, both would be free to recover damages for that loss themselves. For example, if adulterated food had caused animal illness or fatalities, both Land O' Lakes and its customers could have brought actions against Defendants to recover any damages they sustained. Insofar as the record in this case shows, however, no such losses occurred.

6

Nor is this a case in which denying Land O' Lakes damages it did not sustain results in a windfall to the Ratajczaks. They have not retained the fruits of their alleged illegality. Upon disclosure of the fact that they were adding urea to WPC-34, the Ratajczaks returned close to $13 million of the purchase price that was received for their Packerland stock. Further, not only did they risk significant claims from Land O' Lakes and its customers had their conduct actually caused losses, but adding urea also could have subjected them to criminal liability, fines and other penalties. Wis. Stats. § 94.72(14). These are the type of consequences that would deter most people from undertaking such conduct.

In sum, this is not a pass-on case. Critically, Land O'Lakes does not allege that there was any harm that was passed on to its customers. Land O'Lakes does not state that it sold an inferior product as a result of the Ratajczaks' actions or that they were forced to increases prices because of production difficulties. Land O'Lakes has presented no evidence that any animals suffered or were malnourished as a result of the decreased protein levels in Packerland's WPC. None of Land O'Lakes' customers complained and no products were returned. Therefore, the proper question remains whether Land O'Lakes suffered any actual injury. *Tietsworth v. Harley-Davidson*, Inc., 2004 WI 32, ¶ 17, 270 Wis. 2d 146, 158, 677 N.W.2d 233, 239 ("[W]e have generally held that a tort claim is not capable of present enforcement (and therefore does not accrue) unless the plaintiff has suffered actual damage."). Land O'Lakes concedes that it did not lose any profits as a result of using Packerland WPC. As a result, Land O'Lakes has failed to show that it has suffered any actual injury.

A showing of actual injury is essential to both Land O'Lakes' fraud and RICO claims. *See Tietsworth*, 2004 WI 32, ¶ 17 ("The amended complaint must adequately plead an actual injury . . . in order to state an actionable fraud claim."); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496

(1985) (holding that a plaintiff must allege an injury to have standing in RICO cases). The same is true for Land O'Lakes' WOCCA claim. *State v. Evers*, 163 Wis. 2d 725, 732, 472 N.W.2d 828, 831 (Ct. App. 1991) ("Because WOCCA was patterned after RICO, we have held that federal case law interpreting RICO is persuasive authority in our interpretation of WOCCA."). Land O'Lakes' conspiracy claim also fails absent actual damage and an actionable tort claim. *See Onderdonk v. Lamb*, 79 Wis. 2d 241, 247, 255 N.W.2d 507, 510 (1977).

Nor can Land O'Lakes prove an actual injury by requesting the remedies of rescission, disgorgement, and benefit of the bargain, all of which relate to the Ratajczaks' wrongfully obtained profits (rather than harm to Land O'Lakes). The remedies of rescission and disgorgement would not be appropriate in this case. Rescission allows parties to unmake a contract. *See Black's Law Dictionary* (10th ed. 2014) (defining rescission). Rescission damages "are awarded to return a party to the position that party occupied before the wrongful act." *Wickenhauser v. Lehtinen*, 2007 WI 82, 302 Wis. 2d 41, 78, 734 N.W.2d 855, 874. Here, the time for rescission has passed. "Rescission is always coupled with restitution: the parties return the money, property or other benefits so as to restore each other to the position they were in prior to the transaction." *Head & Seemann, Inc. v. Gregg*, 104 Wis. 2d 156, 159, 311 N.W.2d 667, 669 (Ct. App. 1981), *aff'd and remanded*, 107 Wis. 2d 126, 318 N.W.2d 381 (1982). Land O'Lakes has accepted, processed, and sold the defective WPC and cannot now return it to Packerland. Disgorgement would also be an inappropriate remedy in this case. Disgorgement is an alternative remedy for contract claims, not a stand-alone claim. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 39 (2011); *Boston Sci. Corp. v. Mirowski Family Ventures, LLC*, 2012 WL 3579884, at *6 (S.D. Ind. Aug. 17, 2012).

Therefore, each of Land O'Lakes' claims must be dismissed.

8

**CONCLUSION**

Given my conclusion that all of Plaintiff's claims should be dismissed for failure to show an actual injury, I need not consider the Ratajczak's alternative arguments based on RICO's statute of limitations and the economic loss doctrine. Based upon the foregoing analysis Defendant's motion for summary judgment (ECF No. 133) is **GRANTED**.

**SO ORDERED** this 24th day of August, 2016.

        s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Judge

9